FILED

2026 May-01  AM 11:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

**RONALLDUS THOMPSON,**

    **Plaintiff**,

**v.**

**NORTH AMERICAN LIGHTING, INC.,**

    **Defendant**.

**Case No. 3:24-cv-55-HDM**

## MEMORANDUM OPINION AND ORDER

This case arises out of the termination by Defendant North American Lighting, Inc. ("NAL") of Plaintiff Ronalldus Thompson from his role as a temporary employee. This case is before the court on NAL's motion for summary judgment. (Doc. 30).

## BACKGROUND

NAL is a manufacturer of automotive lighting. (Doc. 33, ¶ 1). Thompson began working with NAL in Muscle Shoals in June 2022 as a temporary employee assigned from Elwood Staffing. *Id.*, ¶ 2. Le'Vann Hood was the General Foreman during the entirety of Thompson's time with NAL. *Id.* All employees, including temporary ones, are provided with an employee handbook that describes NAL's

policies against harassment, discrimination, and retaliation and outlines how to make a complaint if any of those should occur. *Id.*, ¶ 1. NAL maintains written instructions on how to operate pieces of equipment, and employees who train on assembly lines are generally provided with a book containing standard operating practices. *Id.*, ¶ 3. Thompson never confirms whether he was trained with these manuals. (Doc. 38, ¶ 3).

Blake Bates trained Thompson when he was first hired. *Id.*, ¶ 4. Two weeks later, Thompson was moved to an assembly line for a different kind of headlight, where he did not receive any training. *Id.* Next, he was transferred to Cody Owens's line where Jada Kizer trained him. *Id.* Finally, Thompson was moved to a fourth line, supervised by Tracy Holt, where he was never trained on how to use the new parts. *Id.* Thompson admits that Hood discussed with him concerns with his work performance two or three weeks after he first began working for NAL. (Doc. 33, ¶ 6).

On July 25, 2022, while working on Owens's line, Thompson complained to Supervisor Nelson Aguares about Owens and, upon Aguares's request, provided a written statement regarding events that occurred in the prior one to two weeks. *Id.*, ¶ 8. Thompson's written statement alleged that Owens asked him if he "like[d] to bend over" and if he "ben[t] over in the shower." *Id.* at 12. Kizer confirmed that Owens asked Thompson this. (Doc. 38, ¶ 12). Thompson's statement also alleged

that Owens called him "bitch" and "motherfucker." (Doc. 33, ¶ 13). Thompson further testified in his deposition that Owens did not use those words toward white people, although Thompson did not indicate that in his prior written statement. *Id.* Additionally, Thompson's statement asserted that Owens "made fun of [Thompson's] name [by] mispronouncing it trying to be funny," "made a joke" about his hair and the cap he wore, and asked to get in Thompson's truck with him. *Id.*, ¶ 15. Kizer heard Owens mocking Thompson's first name. (Doc. 33, ¶ 15).

Thompson's written statement asserted that Owens touched him, even after Thompson told Owens to stop. (Doc. 33, ¶ 16). It also stated that on a certain day, "everything [Owens] said [to Thompson] had something to do with Gay," and that Thompson felt "like [Owens was] trying [him]." *Id.*; (Doc. 38, ¶ 16). Finally, Thompson's statement alleged that, while handling a part, Owens asked Thompson about "sticking that part up [his] ass." (Doc. 33, ¶ 17). Kizer confirmed this, stating that she heard Owens telling Thompson that Thompson would enjoy bending over so that Owens could place a headlight in his buttocks. (Doc. 38, ¶ 17).

On July 26, 2022, after Aguares informed her of Thompson's complaint, HR Representative Anna McGriff instructed Aguares to immediately move Thompson to a new position while the complaint was investigated, a move that Aguares facilitated. (Doc. 33, ¶ 9; Doc. 38, ¶ 9). Thompson said that after he was transferred to a different line, he still felt harassed because Owens could still see him. (Doc. 38,

3

¶ 9). But at no time after this transfer did Thompson have any discussions or other physical interactions with Owens. (Doc. 33, ¶ 10; Doc. 38, ¶ 10).

On July 27, 2022, Thompson spoke briefly with McGriff regarding the statement he had written. (Doc. 33, ¶ 11). On August 8, 2022, McGriff met with Thompson to more thoroughly discuss his complaint against Owens. *Id.*, ¶ 18. Thompson told McGriff that the touching referenced in his statement was Owens repeatedly touching him on the back, and he stated that Owens stopped doing so after Thompson told him a second time to stop. *Id.*, ¶ 19. Thompson later stated in his deposition that Owens also brushed up against Thompson's buttocks in a sexual manner. (Doc. 38, ¶ 19). McGriff confirmed with Thompson that Owens (1) called him a "motherfucker" and a "bitch" multiple times, (2) made fun of Thompson's name, hair, and cap, (3) did internet searches of and spread rumors about him, and (4) asked him about bending over. (Doc. 33, ¶ 20; Doc. 38, ¶ 20).

Thompson reiterated to McGriff that Owens "kept trying him" and had "gay conversations" with him. (Doc. 33, ¶ 21; Doc. 38, ¶ 21). He also reiterated that Owens said he would stick a part inside of Thompson. (Doc. 33, ¶ 21; Doc. 38, ¶ 21). In his deposition, Thompson added that Owens confronted Thompson about having an account on Grindr that was sexual in nature—which Thompson denies—and invited Thompson to go to a "gay club" with him in Littleville, Alabama. (Doc. 38, ¶ 21). Thompson confirmed to McGriff that once Owens was removed as

4

Thompson's team leader, Thompson had had no further physical or verbal interactions with him. (Doc. 33, ¶ 22; Doc. 38, ¶ 22).

During her investigation, McGriff also obtained statements from Kizer and Owens. (Doc. 33, ¶ 23). In a written statement dated July 26, 2022, Kizer stated that Thompson and Owens had a "side conversation" where Owens told Thompson he "heard a lot of bad things about him" and "if you are gay, I'll still be your friend." (Doc. 33, ¶ 24; Doc. 38, ¶ 24). Kizer indicated that Owens told her that, if she told others that Thompson and Owens were having these conversations, he would spread a rumor that Kizer wanted to sleep with him. (Doc. 33, ¶ 24; Doc. 38, ¶ 24; Doc. 31-1 at 33).

McGriff also met with Kizer personally. (Doc. 33, ¶ 25). Kizer told McGriff that she never witnessed Owens touching Thompson. *Id.* Kizer indicated that she thought the relevant interactions between Owens and Thompson were "a way to feel each other out on their sexuality." *Id.* Kizer confirmed that Owens conducted internet searches on Thompson and other employees with his personal phone. (Doc. 33, ¶ 26; Doc. 38, ¶ 26).

In his statement to NAL also dated July 26, 2022,[1] Owens asserted that Thompson inquired whether Owens was gay, that Thompson told Owens he thought

---

[1] Thompson disputes the truth of assertions that Owens makes in his statement but does not dispute that Owens's statement contains such assertions. (*See* Doc. 38, ¶¶ 27–28). Because much of this

Owens was "in the closet," and that Thompson implied that Owens had a relationship with another male employee. (Doc. 33, ¶ 27). Owens responded that he was not gay, that sexual orientation "shouldn't matter," and that he would "still be friends" with Thompson if Thompson was gay. *Id.* Owens's written statement also asserted that Thompson referred to a female employee as a "chocolate covered strawberry and delicious" while talking to Owens and several others. (Doc. 33, ¶ 28). Owens's statement asserts that during that same conversation, Owens told the group that he and his wife honeymooned with another couple, at which point Thompson inquired whether Owens was bisexual and implied that Owens and his wife are swingers. *Id.* In his statement, Owens admitted doing an internet search of Thompson. *Id.*, ¶ 29. Finally, Owens's statement indicated that Thompson, after spreading a rumor among other employees that Owens was "on some gay shit" and "into gay stuff," questioned employees as to why they had not informed Thompson of Owens's sexual orientation. *Id.*

Owens admitted to asking Thompson if he bends over in the shower and to put his socks on. *Id.*, ¶ 31. Owens also admitted to commenting on Thompson's hair. *Id.*, ¶ 32. Finally, Owens admitted to touching Thompson by patting him on the back. *Id.*, ¶ 33. However, Owens denied that he stated he would stick a part inside

---

case revolves around what NAL knew and when it knew it, Owens's statement is properly considered, despite Thompson's objections to it.

Thompson or that he asked Thompson about his sexual orientation.[2] *Id.*, ¶ 34. This was all the information regarding the allegations in Thompson's written statement that McGriff had at the time of Thompson's discharge. *Id.*, ¶ 35.

After being transferred off Owens's line, Thompson worked on his final assembly line under the supervision of Holt. *Id.*, ¶ 36. On August 22, 2022, Holt wrote Thompson a "No Impact Coaching"—essentially a memorandum laying out changes that the employee must make to meet NAL's expectations—which Thompson testified he never received. (Doc. 33, ¶ 36; Doc. 38, ¶ 36). The No Impact Coaching references Thompson's refusal to work in another plant for the day as instructed or to comply with his supervisor's instruction as to when his breaks would be.[3] (Doc. 33, ¶ 36). On August 25, 2022, Holt wrote another No Impact Coaching—which Thompson testified he also never received—that stated that Thompson built fifteen bad sub parts and failed to place an LED board where it was supposed to go. (Doc. 33, ¶ 37; Doc. 38, ¶ 37).

---

[2] For purposes of Thompson's sexual harassment claim, the court construes all facts in the light most favorable to Thompson and, accordingly, assumes that Owens's denials are false. But for Thompson's retaliation and discrimination claims, the court must look to the employer's motivations, *see Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (requiring the court to evaluate the employer's discriminatory intent), which requires an understanding of what the employer knew and when. Thus, Owens's denials to NAL are relevant on these claims.

[3] Thompson disputes that allegations contained in the No Impact Coaching documents are true, but he does not dispute that the No Impact Coaching documents contain such allegations. (Doc. 38, ¶ 36).

On August 26, 2022, Holt emailed the Company's HR Department complaining that there were three more rounds of bad parts. (Doc. 31-2 at 97). Holt also wrote that Thompson was having "lots of issues adjusting to assembly," noting that he was "eighther [sic] scared of the machines or he says he just cant [sic] do it." *Id.* Hood responded, stating:

> What Tracy [Holt] is trying to say is . . . . Please end Ronalldus Thompson[']s assignment. Please see the following reasons which lead to our decision[:]
>
> > Operator [is] afraid of equipment . . . [W]e have placed Ronaldus [sic] on several lines and he states he's afraid the equipment will hurt him . . . . [For] example he won't load a lens in [the] welder because he [is] afraid he will get burn[ed].
> >
> > We have placed him on several sub lines in which over the past 2 weeks he has created multiple occurrences of downtime due to producing scrap.
> >
> > As previously stated [he is] producing scrap . . . . [W]hen you inform him of [an] issue he claims its [sic] not his fault.
>
> Please end his assignment.

*Id.* at 98 (all ellipses in original). McGriff replied, "You can release him now. Elwood [Staffing] has been notified. Please take his badge and clock him out. Also, please notify us when this has been completed." *Id.* at 99. Hood replied, "Nelson [Aguares] is doing it now." *Id.*

The issues discussed in this email chain occurred while Thompson was working on Holt's team, not Owens's. *Id.* at 97–99; (Doc. 33, ¶ 41). McGriff asked Thompson's supervisors if he had received adequate training—an issue that

8

Thompson brought up later, *see supra*—but she did not investigate the matter with Thompson personally. (Doc. 33, ¶ 41; Doc. 38, ¶ 41). Nonetheless, McGriff had no knowledge of any complaints Thompson had regarding training when she approved his termination. (Doc. 33, ¶ 41; Doc. 38, ¶ 41).

On August 26, 2022, after his assignment was terminated by NAL, Thompson called NAL's complaint hotline. (Doc. 33, ¶ 42). In his complaint, Thompson reiterated many of the same assertions made in his initial written complaint but also asserted new allegations regarding retaliation and a lack of adequate training. *Id.* Specifically, Thompson said,

> I was set up this week without a[] team leader and without anybody to train me to do some expensive parts for Japan. Nobody trained me on those head lights. They set me up and put me over there and had me working making bad parts so they could have a reason to fire me, because I came forward on what Cody Owens did to me. It needs to be investigat[ed] . . . .

(Doc. 38, ¶ 42).

After receiving this complaint, McGriff interviewed Kizer again. (Doc. 33, ¶ 43). Kizer stated that Owens "Googles everyone that comes to his line." *Id.* She confirmed that Owens called Thompson a "motherfucker" and a "bitch," stating that "motherfucker" was Owens's "favorite word" and noting that he used it toward other employees as well. *Id.* However, she stated she did not "take it in an offensive way" as Owens did not "mean any harm by it." *Id.* Kizer told McGriff for the first time

9

that Owens said Kizer—who is African American—was "too dark for his liking." *Id.*, ¶ 46.

The following day, September 14, 2022, McGriff interviewed Owens. *Id.*, ¶ 47. Owens admitted that after Kizer told Owens that Owens's wife, who is African American, was "too light-skinned" for Owens and that he "needed to get a darker girl like [Kizer]," Owens said to her, "you're too dark for me, I like my light-skin wife." *Id.* Owens did not receive corrective action for making this comment to Kizer, though he did, with Hood accompanying him, apologize to her. (Doc. 38, ¶ 47).

On September 23, 2022, McGriff again interviewed Kizer. (Doc. 33, ¶ 48). Kizer reiterated that Owens used the phrases "bitch" and "motherfucker" regularly, and although she characterized his use of those terms as "in a playful way," *id.*, she never witnessed Owens call white employees motherfucker, (doc. 38, ¶ 48). Kizer told McGriff that Thompson and Owens "jok[ed] back and forth [and] call[ed] each other names." (Doc. 33, ¶ 49).

As a result of the investigation, Owens was suspended for three days without pay. *Id.,* ¶ 51. Owens received a Final Warning in September 2022, which listed specific issues and observations as follows: "manager comments, lack of professional behavior, inappropriate comments, behavior that hindered production, personal cell phone use on production floor, failure to meet expectations as a team leader." *Id.*

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In determining whether the movant has met this burden, courts must view the evidence in the light most favorable to the non-movant." *Anthony v. Georgia*, 69 F.4th 796, 804 (11th Cir. 2023). A genuine dispute of material fact exists when "the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment always bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## DISCUSSION

Thompson brings two counts of racial discrimination under 42 U.S.C. § 1981 (Count I) and Title VII of the Civil Rights Act of 1964 (Count II), one count of sexual harassment under Title VII (Count III), and two counts of retaliation under

11

Section 1981 (Count IV) and Title VII (Count V). For the reasons explained below, NAL's motion for summary judgment is due to be **GRANTED** on all counts.

### I.      Racial Discrimination

Thompson brings two counts of racial discrimination—one under Section 1981 (Count I) and one under Title VII (Count II). (Doc. 1 at 8–15). Both claims are brought on the basis of Thompson's discharge from NAL. *See id.* ¶¶ 77, 80–104; Transcript of Oral Argument at 13–14. Because these two claims are analyzed under the same framework, *see Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 n.6 (11th Cir. 2018), the court will discuss them together.

The Eleventh Circuit in *Ismael v. Roundtree* recently clarified the applicable framework. 161 F.4th 752 (11th Cir. 2025). In the past, under the *McDonnell Douglas* burden-shifting framework, courts strictly adhered to a tripartite evidentiary burden-shifting framework to determine whether it was appropriate to dismiss a case at the summary judgment stage. *Id.* at 759 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). That test is as follows:

1. First, the plaintiff demonstrates a *prima facie* case, which may be done by showing: (i) the plaintiff is in a protected group; (ii) the plaintiff was well qualified; (iii) the plaintiff suffered an adverse employment action; and (iv) the plaintiff was treated less favorably than similarly situated employees outside of the plaintiff's protected group.
2. Second, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse action.

12

3. Third, if the employer provides an adequate reason, the plaintiff has the opportunity to demonstrate that the employer's proffered rationale is pretextual.

*Id.* (citing *McDonnell Douglas Corp.*, 411 U.S. at 802–04).

But the Eleventh Circuit has held that *McDonnell Douglas* was "never was intended to be[] the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). In *Smith*, the Eleventh Circuit held (1) that a "plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent," and (2) that a "triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* This holding has been referred to as the "convincing mosaic standard." *Ismael*, 161 F.4th at 760 (brackets omitted).

Under the convincing mosaic standard,

a plaintiff may avoid summary judgment by presenting a wide range of circumstantial evidence. Such evidence may include "(1) suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual."

*Id.* (quoting *Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1185 (11th Cir. 2019)). The convincing mosaic standard is not a separate test, but rather "is a stand-

in for the Rule 56 summary judgment standard applied to employment discrimination." *Id.* Due to widespread confusion about how the convincing mosaic standard interacts with the *McDonnell Douglas* burden-shifting framework, the Eleventh Circuit in *Ismael* laid out a step-by-step approach to employment discrimination issues at the summary judgment stage. *See id.* at 764–65. "The roadmap differs depending on whether the plaintiff can demonstrate a *prima facie* case or not." *Id.* at 764.

If a plaintiff can show a *prima facie* case of discrimination, he "is entitled to a rebuttable presumption of illicit intent. This necessarily means that if the defendant fails to proffer evidence of a legitimate reason for the adverse employment action, summary judgment in favor of the plaintiff is appropriate." *Id.* If, on the other hand, the defendant does proffer evidence of a legitimate reason, they successfully rebut the presumption of illicit intent. *Id.* At that point, "'the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant.' It 'simply drops out of the picture.'" *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993)).

> At this point, the court must proceed to ask whether 'the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination [or retaliation] by the decisionmaker.' *Smith*, 644 F.3d at 1328. A showing of pretext (or lack thereof) would certainly be relevant. But a plaintiff's inability to disprove the defendant's rationale cannot be the sole grounds for summary judgment.

*Id.* (modification in original). Indeed, "summary judgment should not be granted for failure to demonstrate pretext unless it also reflects a failure to put forward enough evidence for a jury to find for the plaintiff on the ultimate question of discrimination or retaliation." *Id.* at 763 (internal quotation marks omitted).

If a plaintiff cannot show a *prima facie* case of discrimination, he does not automatically lose on summary judgment. *Id.* at 764. Instead, "the plaintiff must produce enough evidence, on [his] own and without any helpful evidentiary burdens or presumptions, to demonstrate a material issue of triable fact. A court, therefore, should advance directly to the convincing mosaic inquiry." *Id.* at 765.

In other words, then, "*McDonnell Douglas* . . . offers plaintiffs an evidentiary advantage if their case satisfies a preliminary assessment, namely, the *prima facie* case. If plaintiffs cannot satisfy that test, the inquiry does not end. Rather, a district court must turn to evaluate the evidence before it, applying the duly promulgated Rule 56 summary judgment standard." *Id.*

In keeping with the Eleventh Circuit's *Ismael* roadmap, the court will begin by determining whether Thompson has demonstrated a *prima facie* case of discrimination under *McDonnell Douglas*. First, NAL does not dispute the first and third elements of *McDonnell Douglas*'s *prima facie* test, admitting that Thompson is a member of a protected group and that he suffered an adverse employment action. (Doc. 33 at 19). NAL does dispute the second and fourth elements, arguing that

Thompson has not shown that he was well qualified for the position in question or that he was treated less favorably than similarly situated employees outside of his protected group. *Id.*

As to the first of these two disputed elements, a plaintiff asserting a racial discrimination claim "need only show that he or she satisfied an employer's objective qualifications." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769 (11th Cir. 2005). The plaintiff's burden is "not onerous." *Id.* "The employer may then introduce its subjective evaluations of the plaintiff at the later stages of the *McDonnell Douglas* framework." *Id.*

First, NAL argues that Thompson's poor job performance demonstrates that he was not qualified to hold the position. (Doc. 33 at 19–20). NAL makes no other arguments regarding Thompson's qualifications. *See id.* NAL also states that Thompson's poor work performance serves as a legitimate reason for his termination, and that Thompson cannot show that that reason is pretextual. *Id.* at 22–25. However, NAL's arguments conflate Thompson's burden of showing that he was qualified, which is not onerous, with his ability to show pretext, which is much more difficult. *See Vessels*, 408 F.3d at 769. And "we cannot reconcile a rule that would essentially require a plaintiff to prove pretext as part of his *prima facie* case at the summary judgment stage with the Supreme Court's instruction that the plaintiff's *prima facie* burden is not onerous." *Id. See also Holifield v. Reno*, 115

F.3d 1555, 1562 (11th Cir. 1997), *abrogated on other grounds by Lewis v. City of Union City, Georgia*, 918 F.3d 1213 (11th Cir. 2019) ("The defendants also argue that Holifield was not qualified for his job at FCI Marianna. Because the issue of Holifield's job performance is intertwined with the issue of whether his termination was pretextual, Holifield's job performance will not be examined until a later stage of the *McDonnell Douglas* analysis."). Therefore, NAL's arguments about Thompson's job performance cannot serve to undermine any evidence of qualification that he puts forth.

However, Thompson puts forth no such evidence. Instead, Thompson merely argues that, under *Ismael*, it is not necessary to demonstrate a *prima facie* case of discrimination to survive a summary judgment challenge, relying instead on the convincing mosaic standard. (*See* Doc. 38 at 22). Although under *Ismael*, the first step in any racial discrimination analysis is to determine whether the plaintiff has made out a *prima facie* case of discrimination, Thompson is correct that such a *prima facie* case is not necessary to survive summary judgment. *See Ismael*, 161 F.4th at 765. And "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments[] . . . ." *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citing *Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990)). Nonetheless, the

17

court looks to the record in this case, which shows that, at the time of his employment with NAL, Thompson held a college degree in public relations (2022) as well as a high school diploma (2011). (Doc. 31-5 at 4). He held no professional licenses or certifications. *Id.* at 4–5. Thompson's prior work experience included working as a cook at five different fast-food restaurants, working in production at a paper-shredding company and two food processing companies, and working as a stocker at a big-box store. (Docs. 31-6 at 6–7; 31-5 at 5). NAL's Hourly Team Member Handbook defines "qualifications" as "related experience, training and education." (Doc. 31-11 at 100). Although his burden is not onerous, it is still his to carry, and without more, Thompson's education and experience does not constitute qualification under NAL's definition.[4]

NAL also argues that Thompson has not proffered a valid comparator and thus that he fails to establish a *prima facie* case of discrimination for that reason too. (Doc. 33 at 20–22). In making out a *prima facie* case of race discrimination, Thompson must identify comparators of a different race who were "similarly situated in all material respects" and were not subject to the same mistreatment. *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1218 (11th Cir. 2019) (*en banc*). Comparators typically must have "engaged in the same basic conduct as the

---

[4] Although Thompson could possibly generate an argument that such education and experience does constitute "qualification," the court is under no obligation to craft an argument for him when such a conclusion is not facially obvious. *See Resol. Tr. Corp.*, 43 F.3d at 599.

18

plaintiff; been subject to the same employment policy; had the same supervisor; and shared the plaintiff's employment or disciplinary history." *Lukie v. MetLife Grp., Inc.*, No. 22-10967, 2024 WL 4471109, at *4 (11th Cir. Oct. 11, 2024).

As was the case with qualification, Thompson puts forth no comparator evidence, instead skipping to the convincing mosaic standard under *Ismael*. (*See* Doc. 38 at 23–25). Thompson does state in his deposition that Owens "only got a slap on the wrist" for his actions while "if it had been a person of my color [who] did that to [Owens] and was a team leader, they probably would have lost their job fast." (Doc. 31-5 at 25). However, Thompson provides no example of any such person of color who was treated less favorably than Owens. Further, Owens is not a proper comparator to Thompson himself. Owens did not engage in the same basic conduct or misconduct as Thompson, and there is no allegation that Owens, like Thompson, had a history of poor performance. The policies governing Thompson's scrap production and insubordination are not the same policies governing the behavior of which Owens was accused, nor do the two individuals have similar disciplinary histories. Further, Thompson himself acknowledges that he and Owens held different positions in 2022, with Owens working as a team lead and Thompson working as a temporary employee on the assembly line. (Doc. 31-14 at 5; Doc. 31-5 at 5, 6). Finally, Owens was an actual employee for almost five years longer than Thompson was a temporary employee. (Doc. 31-14 at 4–5; Doc. 31-5 at 5, 6).

19

Thompson and Owens are not similarly situated in all material respects, and thus Owens is an inappropriate comparator. *Lukie*, 2024 WL 4471109, at *4.

Because Thompson failed to establish an appropriate comparator, and because he has not put forth evidence of qualification, he fails to establish a *prima facie* case of discrimination. Therefore, under *Ismael*, he receives no presumption of discrimination, and the court must proceed to a convincing mosaic analysis. *See Ismael*, 161 F.4th at 765.

A convincing mosaic can be established through circumstantial evidence that may include systematically better treatment of similarly situated employees, pretext in the employer's justification, suspicious timing, ambiguous statements, or other evidence from which a discriminatory intent might be drawn. *Ismael*, 161 F.4th at 764–65. Here, Thompson cannot establish a convincing mosaic of discrimination because while there is significant evidence showing that Thompson was discharged for non-discriminatory reasons, there is no evidence showing that those who made the termination decision harbored any discriminatory intent.

First, the decision to discharge Thompson was made by Holt, Hood, and McGriff. (Doc. 31-2 at 97–99; Doc. 31-13 at 4; Doc. 31-1 at 20–21, 23–24; Doc. 31-11 at 23). To establish intentional discrimination through whatever method of analysis, it must be shown that *these decisionmakers* intentionally discriminated against Thompson. *See Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1218 (11th

20

Cir. 2021) (reasoning the "sole concern is whether unlawful discriminatory animus motivate[d]" the decision to terminate). Thompson has not produced evidence from which a reasonable jury could so find.

McGriff stated that the issues regarding Thompson's performance leading to his discharge as a temporary employee were "under a different supervisor/team leader and did not involve anything regarding his complaints with Cody Owens." (Doc. 31-2 at 103). Moreover, she had no knowledge of Thompson's complaints regarding his training when she approved his termination. (Doc. 31-1 at 26). Although Thompson disputes that these decisionmakers harbored no discriminatory animus, he introduces no actual evidence of such animus to counter the significant evidence produced by NAL that its decisionmakers based their decision solely on Thompson's poor job performance. (*See* Doc. 31-2 at 97–99). "[U]nsupported speculation does not meet a party's burden of producing some defense to a summary judgment motion. Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (quoting *Hedberg v. Ind. Bell Tel. Co.,* 47 F.3d 928, 931–32 (7th Cir. 1995)) (ellipses omitted); *see also Lewis-Webb v. Qualico Steel Co.*, 929 F. Supp. 385, 392 (M.D. Ala. 1996), *aff'd without op.*, 113 F.3d 1251 (11th Cir. 1997) ("Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches,

21

intuitions or rumors; discrimination law would be unmanageable if disgruntled employees could defeat summary judgment by speculating about the defendant's motives.").

Instead of creating a genuine issue of material fact regarding the *decisionmakers'* motivations, Thompson attacks Owens for his alleged discriminatory animus. (*See* Doc. 38 at 25–26). But Owens played no part in terminating Thompson, and thus any discriminatory animus on his part—even if proven—cannot defeat summary judgment. *See Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1339 (11th Cir. 2024) (affirming summary judgment when alleged discriminatory comments were not attributed to the decisionmaker).

For these reasons, Thompson has failed, under *Ismael*'s clarification of the *McDonnell Douglas* burden shifting framework and the convincing mosaic standard, to demonstrate racial discrimination, and summary judgment is due to be **GRANTED** as to Counts I and II.

## II.        Sexual Harassment

The court now turns to Count III, Thompson's claim for hostile work environment based on sexual harassment. (*See* Doc. 1 at 15–18).

To establish a hostile work environment based on sexual harassment, an employee must demonstrate three things: "(1) []he suffered harassment based on sex; (2) the harassment was sufficiently severe or pervasive to alter the terms and

conditions of the employment; and (3) the employer is liable for that environment, either vicariously or directly." *Santana v. Telemundo Network Grp., LLC*, No. 22-13879, 2026 WL 180272, at \*3–4 (11th Cir. Jan. 22, 2026) (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)). NAL moves for summary judgment on the grounds that, as a matter of law, Thompson has not put forth sufficient evidence to prove the second or third elements. (Doc. 33 at 31–34).

As to the second element—severe and pervasive harassment—severity and pervasiveness both involve a two-prong objective and subjective analysis. *Santana*, 2026 WL 180272, at \*3–4. Thus, the "behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceives to be abusive." *Id.* (quoting *Miller*, 277 F.3d at 1276 (internal quotation marks, brackets, and ellipses omitted)). Here, NAL admits for purposes of summary judgment that Thompson subjectively perceived sexual harassment. (Doc. 41 at 12).

As to the objective prong of the test, the Eleventh Circuit has adopted a totality of the circumstances approach, which turns on several factors, including "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Santana*, 2026 WL 180272, at \*11. "The Supreme Court has emphasized that 'no single

23

factor' is necessary to satisfy the objective inquiry of a hostile work environment claim." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993)). And "[t]he objective element of the severe or pervasive inquiry is not measured with mathematical precision but is evaluated based on the surrounding circumstances and the context in which the conduct occurred. . . . The inquiry is[] thus context-specific." *Id.* at 12; *see also Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) ("[W]orkplace conduct cannot be viewed in isolation, but rather is to be viewed cumulatively, and in its social context.").

Here, Thompson has introduced evidence that Owens: (1) regularly rubbed Thompson's back without consent, (doc. 31-5 at 11); (2) rubbed up against Thompson's buttocks in a sexual manner when there appears to have been plenty of space to pass by without doing so, (doc. 31-15 at 13; doc. 31-5 at 11); (3) repeatedly called Thompson a "bitch," (doc. 31-5 at 10); (4) asked Thompson if he would like to see photos of a female coworker's nipple piercing, (doc. 31-15 at 8); (5) twice asked Thompson if he "bends over," apparently implying engagement in anal intercourse, (doc. 31-5 at 9; doc. 31-15 at 10); (6) told Thompson's coworkers that he had an account on Grindr, a hookup app, (doc. 31-5 at 12); (7) invited Thompson to a "gay club," *id.* at 15; and (8) discussed bending Thompson over and placing a car part in his anus, (doc. 31-15 at 10). Although Owens disputes many of these accusations either in whole or based on their context, we take them in the light most

24

favorable to Thompson here. *See Anthony*, 69 F.4th at 804. The court addresses each category of conduct in turn.

First, Owens's rubbing of Thompson's shoulders and rubbing against Thompson's buttocks—although not enough by themselves to constitute severe harassment—may contribute toward a finding of severe harassment. In *Santana v. Telemundo Network Grp., LLC*, the Eleventh Circuit said the record could support severity because the conduct "was not limited to offhand remarks but included repeated, unwanted physical contact, satisfying the severity factor even absent physical assault or threats." 2026 WL 180272, at *13. Likewise, in *Wilcox v. Corr. Corp. of Am.*, the court held that a jury could find severity or pervasiveness where the plaintiff described "daily unwanted physical contact over a period of months." 603 F. App'x 862, 865–66 (11th Cir. 2015). In *Atwell v. Smart Alabama, LLC*, the court found that there was severe harassment after describing conduct in which the harasser "would rub his pelvis area against Plaintiff's buttocks, shoulder, and other body parts," and the first incident occurred when the harasser "acted like he was squeezing through a tight space, even though there was sufficient room to pass by without rubbing against Plaintiff." 546 F. Supp. 2d 1250, 1255, 1264 (M.D. Ala. 2008).

The facts in the case at bar have much in common with those of *Santana*, *Wilcox*, and *Atwell*. Although the contact here did not continue for as long as that in

25

*Santana* and *Wilcox*, Owens repeatedly and over the course of multiple weeks touched Thompson's shoulders in a manner that made Thompson uncomfortable. And Owens—in actions that mirror those of the *Atwell* harasser almost exactly—on several occasions "squeezed" behind Thompson such that Owens's pelvis rubbed against Thompson's buttocks even though there was apparently plenty of room for Owens to pass behind Thompson without such contact. Thus, these instances of unwanted physical contact between Owens and Thompson may contribute to severe harassment.

Second, Owens repeatedly called Thompson a "bitch." Although this may well be harassment, Title VII does not protect against *all* harassment, only that based on a protected category. *Reeves*, 594 F.3d at 808. *Reeves v. C.H. Robinson Worldwide, Inc.* distinguishes between general profanity and gender-specific degradation, explaining that "general vulgarity or references to sex that are indiscriminate in nature will not, standing alone, generally be actionable," but gender-specific insults may contribute to severe harassment. *Id.* at 809. As the Eleventh Circuit in *Reeves* made clear, "when a co-worker calls a *female* employee a 'bitch,' the word is gender-derogatory. . . . [T]he terms 'bitch' and 'slut' are more degrading to women than to men." *Id.* And "[e]ven gender-specific terms cannot give rise to a cognizable Title VII claim if used in a context that plainly has no reference to gender." *Id.* Here, although Thompson claims that Owens only used the

26

word "bitch" toward Black employees, (*see* doc. 33, ¶ 13), he does not claim that Owens only used the word "bitch"—a gendered term—toward women or gay employees. Thus, Owens's use of the word "bitch" toward Thompson, while unprofessional and boorish, is not actionable under Title VII.

Third, Owens made several lewd remarks to Thompson, including twice asking Thompson if he "bends over," apparently implying engagement in anal intercourse, and once discussing bending Thompson over and placing a car part in his anus. Owens claims that the comments about "bending over" are taken out of context and were made after Thompson knocked over a container of screws and attempted to sweep them up with a broom, rather than bending over to collect them. (Doc. 31-2 at 102; Doc. 31-14 at 6, 18; Doc. 31-1 at 7).[5]

Owens's comments about Thompson bending over are similar to comments made by the harasser in *Santana*. 2026 WL 180272, at *3. In that case, the harasser "frequently used sexualized double entendres such as 'market penetration.'" *Id.* The fact that those comments could be construed as non-sexual did not preclude the court from considering them in denying the defendant's motion for summary judgment. *See id.* The *Santana* harasser also told the plaintiff to "spread her legs like she knew how to." *Id.* (internal quotation marks and brackets omitted). This reference to the

---

[5] Owens denies altogether that he stated that he would stick a car part inside of Thompson, (doc. 31-2 at 102, 103), but the court takes Thompson's allegations as true at the summary judgment stage, *Anthony*, 69 F.4th at 804.

plaintiff's experience positioning herself in sexual poses is a very close parallel to Owens's repeated reference to Thompson "bending over." Additionally, in *Santana*, the harasser said to the plaintiff, referencing his office, "can you come in, or do I need to 'cum' in you?" *Id.* This baldly sexual and demeaning comment, although a one-off, was considered by the court in determining that summary judgment was improper. *See id.* This comment has much in common with Owens's comment about bending Thompson over and placing a car part in his anus. Both comments were one-offs, both were extremely vulgar, and both consisted of an overt reference to sexual penetration. Accordingly, Owens's comments may contribute to a finding of sexual harassment.

Finally, Owens told Thompson's coworkers that he had an account on Grindr, a hookup app, and invited Thompson to a "gay club." While these comments, taken alone, may not constitute harassment, in the context of Owens's repeated lewd remarks on the subject of Thompson's sexual preferences and sex life, they appear in a different light. In short, it is reasonable to conclude that these two comments are part of and indicate a larger pattern of sexualized harassment.

Owens's conduct is not an exact match to the harasser's conduct in *Santana*. The *Santana* harasser's conduct was likely more severe and certainly more pervasive. *Santana*, 2026 WL 180272, at *3. Nonetheless, like in *Santana*, in which the Eleventh Circuit overturned a grant of summary judgment to the defendant,

28

Thompson presented evidence that Owens engaged in repeated sexualized conduct, including physical contact and sexual advances. The conduct was frequent and extended beyond isolated incidents to near-daily inappropriate interactions. Thompson described feeling humiliated, anxious, and uncomfortable, reflecting his subjective experience of harassment. Owens also repeatedly made sexually explicit comments and engaged in unwanted physical contact. The record evidence, viewed in the light most favorable to Thompson, creates a genuine dispute of material fact as to whether Owens subjected Thompson to an environment that a reasonable person would find hostile or abusive.

Accordingly, the court must now consider whether NAL—the employer—can be held liable for the actions of Owens—the employee. *See Santana*, 2026 WL 180272, at *3–4. In Title VII harassment cases, the proper test for employer liability depends on whether the harasser was the plaintiff's supervisor or fellow employee. *Compare Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) (giving the test for supervisor harassment) *with Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278 (11th Cir. 2002) (giving the test for co-employee harassment). The record here shows that Owens was not Thompson's supervisor.

"[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim . . . ." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013).

29

Tangible employment actions include "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 429. "The ability to direct another employee's tasks is simply not sufficient. Employees with such powers are certainly capable of creating intolerable work environments, but so are many other co-workers." *Id.* at 439.

On this basis, courts in the Eleventh Circuit have held that employees who direct other employees' day-to-day work but lack authority to take tangible employment actions do not qualify as supervisors. In *Harrison v. City of Tampa*, the court found that an "Interim Team Leader" who the plaintiff "understood . . . to be her supervisor" and who "directed her work" did not meet *Vance*'s definition of supervisor. No. 817-cv-1369-T-2, 2019 WL 2358791, at *8 n.15 (M.D. Fla. June 4, 2019). The court emphasized that "neither of these facts suggests that [the harasser] had the authority to take tangible employment actions against [the plaintiff], as is required under the Supreme Court's decision in *Vance*." In *Terry v. Laurel Oaks Behavioral Health Center, Inc.*, the court addressed whether a unit director who managed employees' day-to-day activities qualified as a supervisor. 1 F. Supp. 3d 1250, 1267 (M.D. Ala. 2014). The court found that the unit director was a supervisor, focusing solely on his ability to "conduct interviews, hire, terminate and coordinate corrective action processes." *Id.*

30

Owens's role is much more akin to the interim team leader in *Harrison* than the unit director in *Terry*. There is no evidence on the record showing that Owens, who was a team leader, had the authority to take tangible employment actions against Thompson. On the contrary, the record shows that NAL's team leaders have no authority to take corrective action against employees. (Doc. 31-1 at 13). If any issues present themselves, team leaders must report them to supervisors, who may then take corrective action if necessary. *Id.* Supervisors and HR personnel, rather than team leaders, make decisions regarding termination of employment. (Docs. 31-1 at 35; 31-11 at 17). External hiring decisions are made by HR, not team leaders. (Docs. 31-1 at 13, 41; 31-11 at 17). Decisions on hiring operators or promoting employees are made by supervisors, not team leaders. (Doc. 31-1 at 14). Benefits for temporary employees (such as Thompson in his assembly operator position) are determined by Elwood Staffing, not anyone at NAL, and any disciplinary issues are addressed by Elwood Staffing. (Doc. 31-1 at 21, 24, 50). Elwood Staffing also decides who is assigned to NAL for assembly operator positions; therefore, neither Owens nor anyone else made (or could have made) a hiring decision about Thompson or any temporary assembly line operator. (Doc. 31-1 at 23, 41). It is supervisors, not team leaders such as Owens, who perform performance evaluations. (Doc. 31-11 at 2, 18). While a team leader has some authority to direct an employee's day-to-day labor, this does not suffice to create vicarious liability. *Vance*, 570 U.S. at 439.

31

Thompson argues that because team leaders may have some influence with supervisors as to termination, they should be considered supervisors themselves. (Doc. 46 at 4). Thompson relies on *Osburn v. Hagel*, a district court case holding that "[s]upervisors are not limited to those who have a formal, 'on the books' power to take tangible-employment actions," but rather include "[a] manager who works closely with his or her subordinates and who has the power to recommend or otherwise substantially influence tangible employment actions, and who can thus indirectly effectuate them." 46 F. Supp. 3d 1235, 1245, *1247 (M.D. Ala. 2014) (citing *Kramer v. Wasatch Cnty. Sheriff's Off.*, 743 F.3d 726, 738 (10th Cir. 2014)). Thompson's argument is unpersuasive for two reasons.

First, *Osburn* is distinguishable from the case at bar. The *Osburn* court did not solely look at what influence the harasser was able to exert over the actual decisionmakers, but instead looked for evidence that he could—despite not being able to hire, fire, or alter benefits—directly impact the plaintiff's job. *See id.* The court found that the harasser's powers included "evaluating work performance of subordinates," "making selections for promotions and reassignments," and "recommend[ing] both discipline [and] salary increases, awards, and bonuses." *Id.* (brackets omitted). On that basis, the court found "a jury could conclude that [the harasser] was a 'manager who work[ed] closely with [the plaintiff] and who ha[d] the power to recommend or otherwise substantially influence tangible employment

32

actions, and who could thus indirectly effectuate them.'" *Id.* at 1247–48 (quoting

*Kramer*, 743 F.3d at 738) (brackets omitted). Here, Thompson has introduced no

evidence that Owens can do any of these things, and indeed the evidence shows that

he cannot. *See supra*. The only piece of evidence put forth by Thompson is the

following excerpt from Hood's deposition:

> Q. Okay. But HR does all the hiring?
> A. Yes.
> Q. Does HR do all the firing?
> A. Yes.
> Q. Is it based on manager, team lead, supervisor, foreman's recommendation?
> A. It's influenced, yes.

(Doc. 31-11 at 64). Beyond the fact that this interaction does not distinguish between

the influence exerted by supervisors', foremen's, or managers' recommendations

versus team leaders' recommendations,[6] this single piece of evidence does not create

a genuine issue of material fact as to whether that Owens was a supervisor based on

*Osburn*'s more lenient definition, much less based on the stricter—and binding—

Eleventh Circuit and Supreme Court definitions.

Second, Thompson's interpretation of *Osburn* would fly in the face of *Vance*'s

explicitly stated rationale. Thompson's application of *Osburn* and *Vance* would

---

[6] Thompson's termination involved recommendations from Holt (Supervisor) and Hood (General Foreman) and a decision to terminate by McGriff (HR), carried out by Aguares (Supervisor). (Doc. 31-2 at 97–99); (*see also* Doc. 33, ¶¶ 2, 5, 8, 9; Doc. 38, ¶ 5 (explaining the roles of Holt, Hood, McGriff, and Aguares)).

33

allow a harasser to be classified as a supervisor any time the harasser could influence the firing of the plaintiff. (*See* Doc. 46 at 4). This is a vague and undefined test that would put the onus on the court to engage in constant line drawing—exactly the sort of test that *Vance* sought to avoid by implementing an "easily workable" test that created a "clear distinction between supervisors and co-workers." *Vance*, 570 U.S. at 432. It was important to the *Vance* court that the test could be "applied without undue difficulty at both the summary judgment stage and at trial. The alternative, in many cases, would frustrate judges and confound jurors." *Id.* Thompson's interpretation of the *Vance* test confounds these objectives. And just this year, the Eleventh Circuit interpreted *Vance* as holding that "an employee is a supervisor for Title VII purposes *only* if empowered to take tangible employment actions such as hiring, firing, or reassigning with significant consequence." *Santana*, 2026 WL 180272, at *14 (emphasis added) (citing *Vance*, 570 U.S. at 424).

Because Owens had no authority to hire, fire, promote, or reassign Thompson to significantly different responsibilities and had no responsibility for any benefits owed to Thompson, he cannot be classified as a supervisor under Title VII and must instead be considered a co-employee. *See Santana*, 2026 WL 180272, at *14; *Vance*, 570 U.S. at 424.

"Where the perpetrator of the harassment is merely a co-employee of the victim, the employer will be held directly liable if it knew or should have known of

the harassing conduct but failed to take prompt remedial action." *Miller*, 277 F.3d at 1278; *see also Wilcox v. Corr. Corp. of Am.*, 892 F.3d 1283, 1287 (11th Cir. 2018). Accordingly, Thompson must establish that NAL was "negligent in failing to prevent harassment from taking place." *Vance*, 570 U.S. at 449. He could establish this through "[e]vidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed." *Id.* at 449. Thompson cannot establish that NAL knew or should have known of the harassing conduct but failed to take prompt remedial action.

NAL provides all employees, including temporary employees such as Thompson, an employee handbook and other policies that describe NAL's prohibition of harassment, discrimination, and retaliation, and outlines its system for registering complaints. (Doc. 31-7 at 2; Doc. 31-8 at 2; Doc. 31-5 at 6; Doc. 31-1 at 38, 40, 41). NAL took swift remedial action once Thompson made a complaint, quickly transferring Owens to a different line, (doc. 31-1 at 30–31), where at no point did he have any further discussions or other interactions with Owens, (doc. 33, ¶ 10; doc. 38, ¶ 10). Thus, Thompson cannot establish that NAL "knew or should have known of the harassing conduct but failed to take prompt remedial action." *Wilcox*, 892 F.3d at 1287.

Accordingly, NAL cannot be held liable for Owens's actions, and summary judgment is due to be **GRANTED** as to Count III.

### III.       Retaliation

Finally, the court turns to Counts IV and V, Thompson's retaliation claims. To establish a *prima facie* case of retaliation, Thompson must show that: "(1) he engaged in statutorily protected expression; (2) he suffered an adverse action; and (3) the adverse action was causally related to the protected expression." *Siudock v. Volusia Cnty. Sch. Bd.*, 568 F. App'x 659, 664 (11th Cir. 2014). The Supreme Court has held that "a plaintiff making a retaliation claim . . . must establish that [his] protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). NAL admits that Thompson "engaged in protected activity in complaining to HR, and NAL acknowledges that his termination qualifies as an adverse action." (Doc. 33 at 30). Thus, the only remaining issue is whether Thompson has created a genuine issue of material fact as to whether his complaint to HR was a but-for cause of his termination.

Thompson does not provide direct evidence of causation. Rather, he argues that NAL's failure to train him and provide him with correct parts is circumstantial evidence that he was set up to fail in order to give NAL an excuse to fire him in retaliation for complaining about harassment. (*See* Doc. 38 at 33–37). Thompson

36

tacitly admits that this is far-fetched, attempting to get out ahead of NAL's "probabl[e argument] that this is all a conspiracy theory on the part of Thompson" by spending several pages discussing Thompson's training and the parts he was given to work with. *See id.* at 36.

There are several issues with this theory. First, Thompson states that Owens's line was the third line Thompson worked on. *Id.* at 3. He also states that he "did not receive any training on the *second* line," before he ever worked on Owens's line and before he filed his complaints of harassment. *Id.* (emphasis added). If Thompson's main argument is that NAL's failure to train him was in retaliation for his complaints about Owens, that argument is severely undercut by this simple timeline because the alleged retaliation would have begun *before* the protected activity. *See Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006); *Chriswell v. Americold Acquisitions*, No. 25-11070, 2025 WL 3677563, at *5 (11th Cir. Dec. 18, 2025) ("[A]s a matter of common sense, Chriswell cannot show a causal thread where her protected activity occurred *after* the relevant decisionmakers decided to fire Chriswell."). This indicates that NAL's alleged failure to adequately train Thompson was unrelated to Thompson's complaints about Owens, thus precluding a claim of retaliation. And although NAL did, in one instance, provide Thompson with incorrect parts, Thompson provides no evidence that this was intentional or that it was in any way related to his complaints about Owens.

37

Second, NAL introduces significant evidence showing that it terminated Thompson for non-retaliatory reasons, and Thompson has introduced no evidence to show that those reasons are pretextual. While "a plaintiff's inability to disprove the defendant's rationale cannot be the sole grounds for summary judgment," a plaintiff's failure to show that the defendant's reasons for termination are pretextual "would certainly be relevant." *Ismael*, 161 F.4th at 764.

NAL claims that it terminated Thompson because of his poor job performance. Thompson himself admitted he had performance issues early in his two-month time with NAL. (Doc. 31-5 at 18). Indeed, Thompson admits that Hood discussed with him concerns with his work performance two or three weeks after he first began his employment. *Id.* Because of his poor performance, Thompson was issued two No Impact Coachings, the first of which referenced Thompson's refusal to work in another plant for the day as instructed or to abide by his supervisor's instruction as to when his breaks would be. (Doc. 31-2 at 94). The second No Impact Coaching referenced Thompson building fifteen bad sub parts and not placing an LED board where it was supposed to go. *Id.* at 96. Both No Impact Coachings stated that Thompson was "not currently meeting expectations," had "been informally disciplined repeatedly for failure to meet those expectations," and failed to adequately communicate with colleagues or meet deadlines. *Id.* at 92, 95. Holt noted three more rounds of bad parts the day after Thompson's Second No Impact

38

Coaching, noting that Thompson was having "lots of issues adjusting to assembly" and he was "eighther [sic] scared of the machines or he says he just cant [sic] do it." *Id.* at 97.

The reasons given by NAL fully explain their decision to terminate Thompson's employment, while Thompson's proffered reasons—which even he admits resemble a conspiracy theory—do little to explain that decision. Thompson fails to introduce evidence creating a genuine issue of material fact as to whether his protected activity was a but-for cause of NAL's adverse employment action. Thus, his retaliation claims fail as a matter of law and summary judgment is due to be **GRANTED** as to Counts IV and V.

### CONCLUSION

For the reasons stated herein, the court **GRANTS** Defendant North American Lighting, Inc.'s motion for summary judgment, (doc. 30), and **DISMISSES** the case. A separate judgment will be issued along with this opinion.

**DONE** and **ORDERED** on May 1, 2026.

**HAROLD D. MOOTY III**
UNITED STATES DISTRICT JUDGE